# DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

| | |
|---|---|
| WATTS CONSTRUCTORS LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CDM CONSTRUCTORS, INC.,<br><br>Defendant. | CIVIL CASE NO. 14-00012<br><br>**ORDER** |

This matter is before the court on a Motion to Dismiss for Improper Venue, or in the alternative, to Transfer Venue, filed by Defendant CDM Constructors, Inc. ("CDM"). *See* ECF No. 8. Therein, CDM moves to dismiss this action for improper venue. In the alternative, CDM requests the court transfer this action to the United States District Court for the Northern District of California. The court has reviewed all pertinent pleadings filed herein and has had the opportunity to hear argument from counsel on November 14, 2014. Based on the analysis set forth *infra*, the court hereby denies the motion in its entirety.

## FACTUAL BACKGROUND

This action arises from a contract between the parties relating to the construction of AAFES Andersen Shopping Center on Andersen AFB, Guam (the "Project"). According to Complaint, Defendant CDM entered into a joint venture with CAPE to submit a proposal to the Air Force Center for Engineering and the Environment ("AFCEE"). Compl. at ¶9, ECF No. 1.[1]

---

[1] This is confirmed by the Declaration of John Czapor, which is appended as Exhibit A to CDM's Memorandum in Support of Motion to Dismiss for Improper Venue. *See* Czapor Decl. at ¶1, ECF No. 9. According to said declaration, CDM, a construction and engineering
(continued...)

According to the Declaration of Mr. Czapor, around April 12, 2006, the CDM/CAPE joint venture was awarded contract number FA8903-06-D-8509. *See* Czapor Decl. at ¶1, ECF No. 9. "This contract did not set a specific price for a specific project, instead it created a contract vehicle for individual 'task orders' . . . to be awarded for HERC projects." *Id.* at ¶2.

On October 3, 2006, AFCEE issued a request for proposal ("RFP") for construction of the Project. Compl. at ¶7, ECF No. 2. The RFP included alleged 95% complete construction documents[2] and specified that the 100% complete construction documents would be sent out as an amendment on or about October 30, 2006. *Id.* at ¶¶7-8.

CDM, as lead for the joint venture, then requested the plaintiff Watts Constructors LLC ("Watts") prepare a bid for the Project. *Id.* at ¶10.

AFCEE did not issue the 100% complete construction documents until November 20, 2006, which only provided the bidders 15 calendar days to review these documents before the bids were due. *Id.* at ¶¶11-12. Nevertheless, Watts timely submitted its bid to CDM on December 5, 2006. *Id.* at ¶14.

On December 5, 2006, Watts and CDM entered into a Master Services Agreement.[3] *Id.* at ¶15. According to the Complaint, under the Master Services Agreement, Watts agreed to furnish services, labor, materials, and equipment for projects based on task orders issued by CDM, and CDM agreed to pay Watts for such services, labor, materials, and equipment. *Id.* According to the Declaration of Mr. Czapor, the Master Services Agreement

> set up a framework for CDM and Watts to potentially enter into agreements for individual projects that would correspond with the "task orders" awarded under the CDM/CAPE prime contract. These agreements between CDM and Watts pursuant

---

[1](...continued) company, entered into a joint venture with CAPE, Inc., another construction and engineering company, on or about October 10, 2005, "for the purpose of preparing a proposal to the U.S. Air Force to execute work under their Heavy Engineering Repair and Construction ("HERC") Indefinite Delivery Indefinite Quantity contract." *Id.*

[2] The Complaint asserts that AFCEE later "admitted that those documents were really only 70% or less complete." *Id.* at ¶25.

[3] A copy of the Master Services Agreement is attached as Exhibit 1 to the Complaint.

to the Master Services Agreement would also be called Task Orders. Czapor Decl. at ¶3, ECF No. 9.

On January 26, 2007, AFCEE awarded the construction contract to CDM/CAPE for over $35 million.[4]  Compl. at ¶16.  In late February 2007, AFCEE issued a notice to proceed with the work, and Watts started working on the Project in February 2007. *Id.* at ¶¶17-18.

It was not until around May 7, 2007 that Watts entered into an agreement to serve as CDM's subcontractor for the Project for a fixed price of $30,703,900.[5]  CDM's Mem. in Supp. at 5-6, ECF No. 9. *See also* Compl. at ¶19, ECF No. 2.  A copy of Task Order 001 is attached as Exhibit 2 to the Complaint.

The parties eventually agreed to various change orders during the Project, and the last change order (Change Order No. 4) modified the contract sum to $29,817,754.12. Compl. at ¶20, ECF No. 2.

Construction was scheduled to be completed by August 14, 2008, but Watts contends that the Task Order provided for a completion date of August 25, 2008. *Id.* at ¶21.  The Project was substantially complete and occupied on or about September 2008.[6]  *Id.*

The Complaint asserts that [t]hrough no fault of its own, Watts was delayed, disrupted, impacted, and accelerated during the performance of its work" under the Master Services Agreement.  Compl. at ¶22, ECF No. 2.  Watts claims that CDM provided it with "defective, incomplete, conflicting, uncoordinated construction documents, and the defects, errors, and omissions came to light as the Project progressed." *Id.* at ¶26.  Because of these alleged defects, errors, and omissions and CDM's purported failure to perform its contractual duties, Watts contends that its work and the work of its sub-subcontractors was "delayed, disrupted, impacted,

---

[4] The government's award of the contract to CDM/CAPE for construction of the Project was Task Order 0003.  Czapor Decl. at ¶6, ECF No. 9.

[5] This agreement was identified as "Task Order 001" to the Master Services Agreement.  Czapor Decl. at ¶6, ECF No. 9.

[6] According to Mr. Czapor, the Project was completed on or around September 8, 2008. Czapor Decl. at ¶13, ECF No. 9.

and accelerated throughout the Project." *Id.* at ¶27. The Complaint also claims that "Watts also performed increased, extra, and/or changed work that was not included in its [Master Services] Agreement and bid. *Id.* at ¶28. Furthermore, the Complaint alleges that "CDM's acts, its failure to act, errors, and/or omissions caused Watts to incur significant costs for investigation of design errors and omissions, coordination of the design, and increased project management services, among other costs." *Id.* at ¶30. Although Watts states that it submitted numerous requests for equitable adjustment to CDM seeking compensation for its increased costs, CDM has not paid these adjustments, which are the subject of this action. *Id.* at ¶31.

According to CDM,

> Towards the end and after construction, CDM and Watts held several meetings between management in Northern California addressing various unresolved contractual matters. No such meeting occurred in Guam. Generally speaking, the parties discussed several topics that relate to the allegations that Watts raised in its Complaint.
>
> [A]t least two of these meeting between management occurred at Watts' office in Novato, California. . . . [A]t least one of these meetings between management occurred at CDM's office in Walnut Creek, California.

Czapor Decl. at ¶¶15-16, ECF No. 9.

## PROCEDURAL BACKGROUND

On August 13, 2014, Watts filed the instant action. The Complaint alleged five causes of action: Breach of Express Contract, Breach of Duty of Good Faith and Fair Dealing, Action on Account, Negligent Misrepresentation, and Prompt Pay Violation. *See* ECF No. 2.

In lieu of filing an answer, on October 9, 2014, CDM filed the instant Motion to Dismiss for Improper Venue, or in the alternative, to Transfer Venue, along with a Memorandum in Support. *See* ECF Nos. 8-9.

On October 31, 2014, Watts filed a Memorandum in Opposition. *See* ECF No. 21.

CDM filed a Reply brief on November 7, 2014. *See* ECF No. 23.

The parties consented to have the below-signed magistrate judge conduct any and all proceedings and enter a final order as to the Motion to Dismiss for Improper Venue, or in the alternative, to Transfer Venue. *See* ECF No. 19.

///

## LEGAL STANDARD

### A.     Rule 12(b)(3) Motion to Dismiss

Rule 12(b)(3) of the Federal Rules of Civil Procedure provides that a court may dismiss a claim for improper venue. Rule 12(b)(3) allows dismissal only when venue is "improper" – a determination made exclusively in relation to whether "the court in which the case was brought satisfies the requirements of federal venue laws." *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*, ___ U.S. ___, ___, 134 S. Ct. 568, 577 (2013). When venue is challenged, courts must "determine whether the case falls within one of the three categories set out in [28 U.S.C.] § 1391(b). If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under [28 U.S.C.] § 1406(a)." *Id.*

Once a defendant challenges the propriety of venue, the plaintiff bears the burden of proving that venue is proper. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). When considering a Rule 12(b)(3) motion to dismiss for improper venue, a court need not accept the pleadings as true and may consider facts outside of the pleadings. *Doe 1 v. AOL, LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009). "[T]he court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party." *Ctr. for Food Safety v. Vilsack*, 2011 WL 996343, at *2 (N.D. Cal. Mar. 17, 2011). If the court determines that venue is improper, it has discretion to dismiss or to transfer venue to a proper court. 28 U.S.C. § 1406(a). *See also Omnicell, Inc. v. Medacist Solutions Grp., LLC*, 272 F.R.D. 469, 473 (N.D. Cal. 2011). Venue must be established as to each claim. *Boudouin v. Dep't of Navy*, 2010 WL 890042, at *2 (N.D. Cal. Mar. 8, 2010).

### B.     Section 1404(a) Motion to Transfer Venue

Even if a court finds that venue is proper, it has discretion to transfer a case to another district pursuant to 28 U.S.C. Section 1404(a). "A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors in its determination whether transfer is appropriate in a particular case." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). In particular, the court should consider (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; (4) ease of access to evidence; (5) familiarity of each

forum with applicable law; (6) feasibility of consolidation of other claims; (7) any local interest in the controversy; and (8) the relative court congestion and time to trial in each forum. *Ctr. for Biological Diversity & Pac. Env't v. Kempthorne*, 2007 WL 2023515 at *3 (N.D. Cal. July 12, 2007).

Typically the defendant must make a strong showing that transfer is appropriate to warrant upsetting the plaintiff's choice of forum. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (internal citations omitted); *see also Ctr. for Biological Diversity & Pac. Env't*, 2007 WL 2023515 at *3 (stating that unless the balance of factors weighs heavily in favor of the defendants, "the plaintiff's choice of forum should rarely be disturbed") (internal citations omitted). Furthermore, "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981). "The degree to which courts defer to the plaintiff's venue choice is substantially reduced where the plaintiff's venue choice is not its residence or where the forum lacks a significant connection to the activities alleged in the complaint." *Id.* (internal quotation marks and citation omitted).

**ANALYSIS**

The first part of CDM's motion seeks dismissal of this action under Rule 12(b)(3) on the ground that Watts has filed suit in the wrong venue. Alternatively, CDM requests this action be transferred to the Northern District of California pursuant to 28 U.S.C. § 1404(a). The court will address these requests separately below.

**A.      Rule 12(b)(3) Motion to Dismiss for Improper Venue**

As directed by the Supreme Court, "[w]hen venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b). If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Atlantic Marine Const. Co.*, 134 S. Ct. at 577. The plaintiff bears the burden of proving that venue is proper. *Piedmont Label Co.* 598 F.2d at 496.

Relevant to the issue here is the second category in Section 1391(b). Watts asserts that Guam is the proper venue based on Section 1391(b)(2). *See* Comp. at ¶6, ECF No. 2 and Opp'n, at 4, ECF No. 21. Pursuant to Section 1391(b)(2), a civil action may be brought in "a judicial

district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2).

CDM argues that Watts' basis for venue in this district is improper since a substantial part of the events giving rise to Watts' Complaint occurred primarily in California. CDM contends that the Complaint's assertions focus on CDM's alleged failures in the events leading up to Watts' bid and the negotiation process. CDM notes that these events occurred primarily in California and not in Guam. According to the Declaration of Mr. Czapor, the Master Services Agreement was "primarily negotiated in California." Czapor Decl. at ¶4, ECF No. 9. CDM staff was primarily in contact with Watts staff[7] at its office in Novato, California.[8] *Id.* The three primary individuals "instrumental in developing and finalizing the Master Services Agreement on behalf of CDM" were Sergio Bazarevitsch,[9] Michael Schwan[10] and John Czapor.[11] *Id.* at ¶5. Similarly, Task Order 001 was "primarily negotiated by Watts through its office in Novato, CA." *Id.* at ¶7. CDM stated that it primarily conducted negotiations for Task Order 001 through its office in Rancho Cucamonga, California. *Id.* at ¶8.

CDM also claims that Watts' "other major contention repeated throughout the [C]omplaint appears to be that CDM failed to adequately pay Watts or process its requests to modify the terms of the Contract." CDM's Mem. in Supp. at 12, ECF No. 9. CDM maintains that the processing of Watts' invoices and the negotiations of changes to the contract occurred again primarily in California and not in Guam. According to Mr. Czapor, the primary management and administration

---

[7] The representatives from Watts' Novato office that were instrumental in negotiating or executing the Master Services Agreement with CDM were Dennis Watts, Fred Thornhill, and Roy Patten. *Id.* Watts' attorney in the Novato office, Robert Tate, was also involved in the negotiation process. *Id.*

[8] Novato is located in Marin County, California.

[9] Mr. Bazarevitsch was vice president of CDM and worked out of CDM's office in Rancho Cucamonga, CA (located in San Bernadino County). *Id.* at ¶5.

[10] Mr. Schwan worked at CDM's office in Walnut Creek, CA. *Id.* at ¶5.

[11] Mr. Czapor was then vice president of CDM based in CDM's office in Edison, NJ. *Id.* at ¶5. It was he who signed the master services Agreement on behalf of CDM. *Id.*

of the Project for CDM took place in its Rancho Cucamonga office. *Id.* at ¶9. "This included reviewing and approving subcontractor invoices, keeping track of project finances, and assessing subcontractor requests to modify the contracts." *Id.* Mr. Czapor asserts that the primary management and administration of the Project for Watts took place at its Novato office. *Id.* at ¶10. According to Mr. Czapor, Watts moved some of its executives from the Novato office to an office in Hawaii at some point, however CDM continued to communicate primarily with Watts' Novato office during the course of the Project. *Id.*

CDM further notes that Watts has not relied on the location of the property in asserting Guam as the proper venue, but instead Watts relies on where the events occurred. *See* Compl. at ¶6, ECF No. 2. CDM argues that although the facility was constructed in Guam, the events giving rise to Watts' Complaint – the negotiation, management and administration of the contractual relationship – did not substantially occur in Guam. CDM contends that the actual property where the Project was constructed is not relevant since it is not the subject of the dispute. Furthermore, CDM points out that neither party owns the property since it belongs solely to the federal government.

Watts refutes CDM's assertions and argues that CDM's motion simply focuses on one triggering event – where the negotiations of the Master Services Agreement and Task Order 001 occurred. Watts asserts that the court must consider all of the events that give rise to this action, not just a single triggering event. *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.* 618 F.3d 1153, 1166 (10th Cir. 2010). Watts claims that the substantial events here include

> Watt's construction of the Project, CDM's timely and proper payment to Watts for work performed at the Project site in Guam, CDM's proper coordination and scheduling of the work at the Project in Guam, providing Watts with complete and proper drawings and specifications that Watts was to use to construct the Project, and dealing with Watts during the performance of the Agreement fairly and in good faith. Watts's Complaint, ¶¶27, 28, 29, 30, and 31.

Opp'n at 6-7, ECF No. 21.

Watts maintains that its claims arise out of the performance of the agreement, and the acts underlying the claims relate to the construction of the Project, which occurred in Guam. The Complaint asserts that the during the construction phase, Watts experienced delays, disruptions,

impacts and accelerations in its work. Compl. at ¶22, ECF No. 2. Watts further claims that CDM failed to timely and properly pay for Watts' work and failed to perform its obligations under the Agreement, which caused Watts to incur additional costs to construct the Project. Watts states that the allegations in its Complaint

> show that the crux of this case is based on CDM's failure to properly perform its contractual duties regarding the design, construction, and management of the Project in Guam – not the negotiation of the Agreement. These acts or omissions by CDM occurred in Guam where CDM had boots on the ground managing the day-to-day construction activities.

Opp'n at 7-8, ECF No. 21.

Despite CDM's contention that the primary management and administration of the Project for Watts took place at its Novato office, Watts asserts that its staff in Guam performed the project management duties. According to the Affidavit of Keith Bender,[12] he "managed the day-to-day construction operations for the Project for Watts." Bender Aff. at ¶5, ECF No. 21-1. Mr. Bender further states that "Watts managed and administered its contractual obligations for the construction of the Project from Watts'[] office and jobsite office in Guam." *Id.* at ¶6. Mr. Bender describes the project management work as follows:

> During the Project, I prepared, reviewed, and negotiated the change orders executed by Watts and CDM. Roy Patten, Watt's Vice President of Operations, who resided in Guam and worked out of Watt's office in Guam from January 2007-December 2008, while the Project was being constructed, also participated in the preparation, review and negotiation of the change orders. Watt's Construction Manager, Bill Beery, worked on the Project from Watt's office in Guam and still resides in Guam.
>
> Decisions made regarding the construction of the Project and the day-to-day operations were made by me at the Project. . . .
>
> Part of my duties on the Project included overseeing the buyout of the labor and materials necessary to construct the Project. I identified and evaluated potential subcontractors for various scopes of work and negotiated subcontracts with them on behalf of Watts. . . .
>
> I prepared Watt's pay applications, requesting payment from CDM for Watt's work on the Project. Watts submitted its pay applications electronically to CDM. Most of the documentation created, prepared, and maintained for the Project was done in an electronic format. Submittals, quality control reports, schedules, and other

---

[12] Mr. Bender states that he was Watt's on-site Project manager from May 2007 through completion, punch list, and warranty period. Bender Aff. at ¶4, ECF No. 21-1 (attached as Ex. A to the Opp'n). He resides and works in Guam. *Id.* at ¶3.

Project records were sent to CDM and the government electronically.

*Id.* at ¶¶9-10, 13 & 15.

Mr. Bender's statements are further supported by the Affidavit of Charles Conway, which is attached as Exhibit B to the Opposition. According to Mr. Conway,[13]

> Watt's primary management and administration of its contractual obligations, the construction of the Project, occurred from Watt's office in Guam and the Project site. . . . With the time zone differences, it was not possible nor reasonable to manage or administer the construction of the Project from any location but Guam. Watts maintained staff at the Project site to perform its contractual obligations under the Agreement.

Conway Aff. at ¶¶7-8, ECF No. 21-2.

According to the Declaration of Mr. Czapor, during the construction phase of the Project, CDM's Guam staff generally consisted of two individuals[14] who oversaw Watts' day-to-day construction efforts. Czapor Decl. at ¶11, ECF No. 9. Mr. Czapor claims that Watts also had a small project management staff[15] located in Guam during the scope of the Project. *Id.* at ¶12.

Watts refutes Jon Czapor's description of the "small project staff" Watts' maintained on Guam. According to the Affidavit of Mr. Bender,

> Watts maintained a large staff at the Project site, which included: a project manager, an assistant project manager, two project engineers, two superintendents, [a] quality control manager, an assistant quality control manager, a safety manager, and jobsite foremen. At various times during the Project, Watts employed more than 10 Project site personnel.

Bender Aff. at ¶11, ECF No. 21-1.

There appears to be some differences in the parties' factual contentions surrounding the location of the negotiations that culminated in both the Master Services Agreement and Task

---

[13] Mr. Conway, who resides and works in Phoenix, AZ, has been employed with Watts for more than 12 years and is currently the Senior Project Manager with Watts. Conway Aff. at ¶3, ECF No. 21-2.

[14] These were Derwin Dy (the site project manager) and Robert Gallinari. Czapor Decl. at ¶11, ECF No. 9. Mr. Dy left Guam some time after the Project was completed. *Id.*

[15] Watts' Guam staff was comprised of Roy Patten (Watts' project executive), Bill Berry (Watts' initial field project manager), and Keith Bender (who later replaced Bill Berry). Czapor Decl. at ¶12, ECF No. 9.

Order 001. CDM asserts that these contracts were primarily negotiated in California. *See* Czapor Decl. at ¶¶4-8, ECF No. 9. Watts, on the other hand, claims that it negotiated the Master Services Agreement and Task Order 001 from its office in Hawaii. *See* Conway Aff. at ¶9. Mr. Conway states that "[a]ltough the Task Order and Agreement,[16] as well as the change orders executed between Watts and CDM, list Watts'[] former office address in Novato, California, Watts'[] personnel in Hawaii and Guam negotiated the Agreement and change orders." *Id.* In resolving these factual conflicts, "the court must draw all reasonable inferences in favor of the non-moving party." *Ctr. for Food Safety*, 2011 WL 996343, at *2. Thus, the court finds that the negotiations for the Master Services Agreement and Task Order 001 did not primarily take place in California as asserted by CDM. Rather, these negotiations involved various individuals located throughout the United States, including Guam, Hawaii, California, Virginia and New Jersey.

But regardless of where these contracts were negotiated, the court agrees with Watts that the substance of the Complaint's allegations focuses on the actual performance of the contracts and the construction of the Project. It is during the construction process where the alleged defects in the documents were discovered, and the subsequent change orders were a result of how the construction progressed on Guam.

There are also factual conflicts regarding where the primary management and administration of the Project took place. Mr. Czapor states that '[t]he primary management and administration of the . . . [P]roject for CDM took place in [its] Rancho Cucamonga office . . and "for Watts took place at its Novato office." Czapor Decl. at ¶¶ 9-10, ECF No. 9. Watts maintains it primarily managed and administered its contractual obligations from its Guam office. *See* Bender Aff. at ¶6, ECF No. 21-1, and Conway Aff. at ¶¶7-8, ECF No. 21-2. The court resolves this factual conflict in Watts' favor. *See Ctr. for Food Safety*, 2011 WL 996343, at *2. Additionally, the court finds it curious that CDM asserts it's primary management and administration of this Project took place in its Rancho Cucamonga office. While CDM may have reviewed and approved invoices and kept

---

[16] According to his affidavit, Mr. Conway use of the term "Agreement" refers to the Master Services Agreement and Task Order. *See* Conway Aff. at ¶5, ECF No. 21-2.

track of project finances from this office, the terms of the prime contract[17] with the federal government would have required CDM to "maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements." 48 C.F.R. § 52.246-12.[18] Thus, part of CDM's management and administration of the Project must have taken place on Guam, where the construction of the Project was occurring, since CDM was required to conduct inspections of the construction work to ensure it conformed with contract requirements. The court tends to agree with Watts' contention that the claims in the Complaint arise out of the construction of the Project in Guam and that Guam has a substantial connection to these claims. Accordingly, venue is proper in Guam, and the court denies CDM's motion to dismiss.

**B.    Section 1404(a) Motion to Transfer Venue**

Although the court has determined that venue is proper in Guam, CDM alternatively moves the court to transfer this action to the Northern District of California.

As discussed earlier, even if a court finds that venue is proper, it has discretion to transfer a case to another district pursuant to 28 U.S.C. Section 1404(a). That statute provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). When a defendant moves for a Section 1404(a) transfer, the defendant bears the burden to show that transfer is appropriate. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979).

As pointed out by CDM, in exercising its discretion to transfer a case, a district court must first determine whether the action could have been brought in the transferee court. If so, then the

---

[17] According to CDM, "[t]he Federal Acquisition Regulation ('FAR') is the primary set of regulations applicable to contracts with the federal government, codified in Chapter 1 of Title 48 of the Code of Federal Regulations." Mem. in Supp. at 24. CDM/CAPE's contract with the federal government "included and incorporated various FAR clauses and similar regulatory provision . . . as a matter of policy and/or discretion." *Id.* at n.1.

[18] Pursuant to 48 C.F.R. 46.312, the federal "contracting officer shall insert the clause at 52.246-12, Inspection of Construction, in solicitations and contracts for construction[.]"

court must consider the relevant factors set forth in Section 1404(a) and "decide, whether, on balance, a transfer would serve 'the convenience of the parties and witnesses' and otherwise promote 'the interest of justice.'" *Atlantic Marine Const. Co.*, 134 S. Ct. at 581. Courts are not limited to Section 1404(a)'s three specific factors. The Supreme Court has endorsed the consideration of various "private" and "public" interest factors.

> Factors relating to the parties' private interests include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Public-interest factors may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." The [c]ourt must also give some weight to the plaintiffs' choice of forum.

*Id.* (internal citations omitted).

### 1. Whether Watts could have filed its suit in Northern District of California

CDM asserts that Watts could have and should have brought this case in the Northern District of California. As discussed *supra*, CDM maintains that a vast majority, if not all, of the alleged events underlying Watts' claims occurred in California. Watts conducted negotiations and administration of the two contracts with CDM from its office located in the Northern District of California, and CDM also had an office in that district that was involved in the Project. And, although the actual construction of the Project occurred on Guam, CDM contends that the business relationship between the parties was centered in California since all negotiations that culminated in the Master Services Agreement and Task Order 001 occurred largely between the parties' California offices. All of Watts' invoices and requests to modify the contract were conducted in California, and CDM notes that at the end of construction when there were still significant unresolved issues between the parties, the management staff of each company met for a series of meeting at the parties' respective offices in the Northern District of California. Thus, CDM maintains that Watts could have filed this suit in the Northern District.

Watts counters that its claims arise out of the performance of the actual contracts with regard to the construction of the Project in Guam. Watts maintained substantial staff in Guam to

manage and administer its performance of the contracts, Watts' primary management of the Project occurred in Guam, and Watts asserts that its personnel located in Guam, Arizona, Hawaii and California were involved in various aspects of preconstruction, proposal, bid and contract negotiations. Bender Aff. at ¶¶9-11, 13 & 15, ECF No. 21-1 and Conway Aff. at ¶¶6-9 & 11.

Again, CDM primarily focuses on where the contracts were negotiated or executed, but in the electronic age where emails, faxes and telephone calls are more often used, it is increasingly likely that negotiation and execution of contracts can take place in mixed locations, which is what happened here. Rather than just focusing on contract negotiations, Watts urges the court to consider where the contract was to be performed and where the contract was allegedly breached. The court finds that even if numerous emails and calls were exchanged with Watts' staff in their Novato office during contract formation, this is insignificant when compared to the other, more substantial events surrounding the day-to-day performance of the contracts and the construction of the Project in Guam. Thus, the court concludes that the Northern District of California would be an improper venue for Watts to have filed its Complaint.

### 2. Consideration of the various relevant factors

Assuming *arguendo* that Watts could have brought its suit in the Northern District of California, the second part of the Section 1404(a) discretionary transfer analysis asks the court to consider the various factors and weigh the competing interests. The court has considered all potentially relevant factors, however, the court will limit its discussion to the factors that are of significance in this case and those addressed by the parties.

First, CDM asserts that convenience of the parties supports a transfer. CDM asserts it is incorporated in Massachusetts and has its principal place of business in the continental United States, while Watts' is an Iowa limited liability company with its principal place of business in Iowa.[19] CDM contends that given the considerable distance between Guam and these other geographic locations, it would be more convenient to litigate this action in the Northern District of

---

[19] CDM notes, however, that Watts' website homepage lists Watts' headquarters as McLean, VA. *See* Mem. in Supp. at 17, ECF No. 9.

California. CDM maintains that travel to and from Guam would be extremely time consuming and expensive for both parties. Finally, CDM argues that any documents or records relating to the contract and the Project that may exist are mostly located in its offices in California (either Rancho Cucamonga or Walnut Creek), not in Guam.

In response, Watts asserts that the Northern District would not be convenient for it. Watts states that it has not had an office in California since 2012, *see* Conway Aff. at ¶13, ECF No. 21-2, whereas Watts continues to maintain a Guam office and still employs persons that worked on the Project in Guam. Bender Aff. at ¶¶3-4 & 12, ECF No. 21-1, and Conway Aff. at ¶3, ECF No. 21-2. Watts also notes that CDM maintains an office in Guam and has an active business registration and contractor license in Guam. *See* Exs. E & F to Opp'n, ECF Nos. 21-5 and 21-6. Watts further asserts that CDM, as part of the joint venture, prepared a proposal for the Project. *See* Ex. D to Opp'n, ECF No. 21-4. CDM's proposal listed a significant number of projects it performed in the Pacific Rim, including Guam, and touted its Guam office's proximity to Andersen AFB as well as its extensive staff.[20] As for CDM's assertion that most of the Project's records were located in California, Watts contends that most of these documents were maintained electronically, including their email communications. Thus, Watts does not believe this argument holds much weight. Based on the parties' arguments, this factor is neutral at best since once party claims that California is a more convenient venue than Guam, while the other party asserts the opposite.

The next factor relied upon by CDM is the convenience of the witnesses. According to CDM, the key individuals for both parties that negotiated the contracts are located in California.[21] Additionally, CDM asserts it would be extremely difficult or unlikely for CDM or Watts to compel the presence of key non-party witnesses, such as former employees, because few reside on Gam

---

[20] The proposal states that the joint venture's Guam staff "consists of one general manager, five project managers, twelve engineers, four quality control managers, four safety managers, six superintendents and sixteen office clerical staff." Ex. D at 15, ECF No. 21-4.

[21] In its Reply brief, CDM asserts that of the various names presented by both sides that were involved in the contractual relationship, eight of these 12 individuals are known or believed to be in California. Reply at 6, ECF No. 23.

and the reach of trial subpoenas for non-party witnesses is limited to 100 miles of where said witness resides, is employed or regularly transacts business in person. *See* Fed. R. Civ P. 45(c)(1)(A). Likewise, CDM is concerned that it may not be able to compel the presence of Watts' officers at trial since they are not present in Guam, and Rule 45(c)(1)(B) limits the reach of trial subpoenas on such officers to command their appearance for trial "within the state where the person resides, is employed, or regularly transacts business in person.

In addition to the high airfare costs to fly its own witnesses to Guam for a trial, CDM notes that sending its senior managers to Guam for trial would require more of a time commitment, resulting in a burden on business operations. Because of these added hardships, CDM claims that a trial would likely rely unnecessarily on deposition as opposed to live testimony, which may hamper the court's adjudication. CDM maintains it would be more likely to gain access to key party and non-party witnesses for trial if the case were transferred to the Northern District.

Watts does not agree that the Northern District of California would be a more convenient forum for the witnesses. Watts contends that although CDM's motion primarily discusses those employees involved in upper management, CDM has failed to consider any inconvenience a trial in Northern California would pose on Watts' other potential witnesses – the lower tier, local sub-subcontractors who performed work on the construction of the Project. Watts asserts that the damages it claims include significant costs incurred by these very sub-subcontractors, who also have no minimum contacts with California. In the event CDM asserts a counterclaim relating to the work on the Project, Watts would likely be precluded from impleading these lower tier sub-subcontractors because the courts in California would not have personal jurisdiction over these subcontractors.

The court believes both parties have raised legitimate concerns with regard to the convenience of the witnesses. Some witnesses are located in Guam, although most of the senior management staff are not. Watts could conceivably require the testimony of the lower tier sub-subcontractors at trial to prove its damages claims. In the end, regardless of whether trial will be held on Guam or the Northern District, some witnesses from both parties will have a long geographic distance to travel and will incur higher airfare costs. CDM's claims, however, that a

trial in Guam would result in additional hardships (*i.e.,* more time commitment for its officers and a burden on its business operations) is belied by the use of modern technology (*e.g.,* emails, smart phones, and Facetime or Skype) to ensure that these senior managers are still able to manage their business operations while they are on Guam for trial. Thus, this factor neither supports nor disfavors a transfer of this case to the Northern District of California.

Finally, CDM asserts that the interest of justice favors transferring this case. First, CDM states that "[t]he unpredictable nature of this court's criminal docket could cause a delay" in this case. Mem. in Supp. At 22, ECF No. 9. It notes that the average civil case in the Northern District is resolved more quickly, with the median time to dispose of civil cases in the Northern District being 6.4 months compared to the median time to disposition in this district being 16.2 months. *Id.* Second, CDM notes that although courts have considered any local interest in the controversy, this factor really has little to no value since this is simply a contractual dispute between two companies who have their principal place of business elsewhere. CDM argues that because the construction on the Project is complete, any localized interest in the case is diminished because it does not implicate the health or safety of Guam's citizens. CDM contends that the localized interest is greater, or at least comparable, in the Northern District, where the contracts were negotiated and administered. Third, with regard to the familiarity of each forum with the applicable law, CDM maintains that neither district has any specialized skill or knowledge in adjudicating this case since the parties' contract was governed by federal government contracting law in the event of a dispute, as opposed to the law of any particular state or territory.

Watts counters that the public interest factors weigh against a transfer of this case. With regard to the judicial economy factor, Watts asserts that in 2013 the Northern District of California had over 5,000 civil cases filed, compared to the 26 cases in this district. Watts contends these figures indicate that this district is much less congested that the Northern District. Additionally, although the median time to disposition of civil cases in the Northern District was 6.4 months, the parties here agreed to a proposed trial date in the draft scheduling order which was beyond the 6.4 month timeframe, and the court eventually approved the parties' proposed trial date. As to any localized interests, Watts asserts that many of its employees and subcontractors were and still are

residents of Guam. Watts argues that this fact when coupled with the fact that the performance of the agreement which gave rise to its claims occurred in Guam supports a denial of CDM's motion to transfer. Finally, Watts asserts that Guam substantive law will apply in this case with regard to its breach of contract claim and the negligent misrepresentation claim. Because this court is more familiar in applying Guam law than the Northern District of California, Watts maintains that venue is proper in this district and should remain here "where it is at home with the law." Opp'n at 20, ECF No. 21.

After considering the public interest factors, the court agrees with Watts that these factors disfavor a transfer of this case, or, at most, are neutral. CDM has not met its burden of showing that a transfer is appropriate. Because the balance of the various factors do not weigh heavily in favor of CDM, the court will honor Watts' choice of forum[22] and deny the motion to transfer.

## CONCLUSION

The court denies CDM's motion in its entirety. The court finds that venue on Guam is proper, and thus the motion to dismiss is denied. Additionally, the court finds that the Northern District of California would be an improper venue, and further finds that the balance of the various relevant factors do not weigh heavily in favor of a transfer. Accordingly, the alternative motion to transfer is also denied.

IT IS SO ORDERED.



/s/ Joaquin V.E. Manibusan, Jr.
U.S. Magistrate Judge
Dated: Nov 20, 2014

---

[22] Although Guam is not Watts' home forum, the court will nonetheless defer to its choice of forum since Guam has a significant connection to the activities alleged in the Complaint and because both parties have offices in Guam and continue to conduct business here.